# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOLVERTHA L.,[1] <br>             **Plaintiff,** <br><br>      v. <br><br> ANDREW M. SAUL,[2] **Commissioner** <br> **of Social Security,** <br>            **Defendant.** <br> _____ | NO. CV 18-9130-KS <br><br> **MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

Nolvertha L. ("Plaintiff") filed a Complaint on October 24, 2018, seeking review of the denial of her application for a period of disability and disability insurance ("DI"). On March 4, 2019, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 14, 19, 20.) On July 3, 2019, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No. 24.) Plaintiff seeks an order reversing

---

[1]      Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2]      The Court notes that Andrew M. Saul is now the Commissioner of the Social Security Administration. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court orders that the caption be amended to substitute Andrew M. Saul for Nancy A. Berryhill as the defendant in this action.

the Commissioner's decision and remanding for further proceedings.  (Joint Stip. at 29-30.)  The Commissioner requests that the ALJ's decision be affirmed.  (*See id.* at 30.)  The Court has taken the matter under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On March 18, 2015, Plaintiff, who was born on November 18, 1958, filed an application for a period of disability and DI.[3]  (*See* Administrative Record ("AR") 184.)  Plaintiff alleged disability commencing October 18, 2013 due to:  torn tendons in both shoulders; torn and inflamed tendons in both elbows; neck pain; wrist and finger pain; and numbness in her upper extremities.  (AR 200.)  Plaintiff previously worked as a "negative assembler," which the vocational expert classified as a film inspector (DOT 976.362-010).  (AR 23, 201, 264.)  The Commissioner denied Plaintiff's application initially (AR 73) and on reconsideration (AR 85).  Plaintiff then requested an administrative hearing.  (*See* AR 100-01.)  On October 11, 2017, Administrative Law Judge Sally C. Reason (the "ALJ") held a hearing at which Plaintiff, who was represented by counsel, testified as did vocational expert Ron Hatakeyama (the "VE") and medical expert Allen Levine (the "ME").  (AR 29-61.)  On January 12, 2018, the ALJ issued an unfavorable decision, denying Plaintiff's application.  (AR 12-24.)  On August 24, 2018, the Appeals Council denied Plaintiff's request for review.  (AR 1-6.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2019.  (AR 17.)  The ALJ further found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 18, 2013.  (AR

---

[3]      Plaintiff was 54 years old on the alleged onset date and was thus defined as a person closely approaching advanced age under agency regulations.  *See* 20 C.F.R. § 404.1563(d).  Plaintiff has since changed age categories and now meets the agency definition of a person of advanced age.  *Id.* § 404.1563(e).

17.)  The ALJ determined that Plaintiff had the following severe impairments:  "mild cervical and lumbar degenerative disc disease with spondylitis; bilateral shoulder rotator cuff impingement and tendinitis; bilateral chronic medial epicondylitis; wrist tendinitis; mild right carpal tunnel syndrome; and chronic strain wrist and fingers."  (AR 17.)  The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  (AR 18.)  The ALJ determined that, during the relevant period, Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations:

> [S]he can never lift overhead or push/pull more than 15 pounds occasionally; she can walk up to 45 minutes at a time and sit up to 60 minutes at a time; she can never crawl or climb ladders, ropes, or scaffolds; she can only occasionally stoop or crouch; she can occasionally reach overhead; she must avoid all exposure to extreme cold and heavy vibratory equipment; and she is precluded from forceful use of the upper extremities and repetitive rotation of the head/neck (e.g., an umpire or referee).

(AR 18.)

The ALJ found that Plaintiff was able to perform her past relevant work as a film inspector (DOT 976.362-010).  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged onset date through the date of her decision, January 12, 2018.  (AR 23-24.)

\\
\\
\\
\\

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (internal citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); *Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in her decision "and may not affirm the ALJ on a ground upon which [s]he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error,

'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (internal citations omitted).

## DISCUSSION

There are three issues in dispute: (1) whether the ALJ erred in her assessment of the medical opinions; (2) whether the ALJ erred in her assessment of Plaintiff's statements about her symptoms and limitations; and (3) whether the ALJ erred in determining that Plaintiff retains the capacity to perform her past relevant work. (Joint Stip. at 4.)

## I. The ALJ's Assessment of the Medical Opinions

### A. Applicable Law

"The ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015). In doing so, the ALJ must articulate a "substantive basis" for rejecting a medical opinion or crediting one medical opinion over another. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

Generally, the opinion of a treating source is entitled to greater weight than the opinion of doctors who do not treat the claimant because treating sources are "most able to provide a detailed, longitudinal picture" of a claimant's medical impairments and bring a perspective to the medical evidence that cannot be obtained from objective medical findings alone. *See Garrison*, 759 F.3d at 1012; *see also* 20 C.F.R. §§ 404.1527(c)(2) (governing claims filed before March 27, 2017), 404.1520c(c) (governing claims filed on or after March 27, 2017). Accordingly, to reject an uncontradicted opinion of a treating or examining physician, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence."

5

*Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017); *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014). Alternatively, "[i]f a treating or examining doctor's opinion *is* contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Trevizo*, 871 F.3d at 675 (emphasis added). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). An ALJ errs when he discounts a treating or examining physician's medical opinion, or a portion thereof, "while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *See Garrison*, 759 F.3d at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

## B. Medical Opinions at Issue

Plaintiff contends that the ALJ improperly discounted the opinions of the treating and examining physicians who saw Plaintiff in connection with her claim for Workers' Compensation by failing to articulate legally sufficient reasons for declining to adopt their assessments of Plaintiff's functional limitations. (Joint Stip. at 6-7.) Specifically, Plaintiff alleges that the ALJ improperly discounted the opinions of Dr. Tabibian, Dr. Kohan, Dr. Haronian, and Dr. Rubanenko[4] on the grounds that these sources could not be considered impartial, did not have disability program knowledge, and did not share the medical expert's familiarity with the longitudinal medical evidence. (Joint Stip. at 6-7.) Defendant contends

---

[4] In the Joint Stipulation, Plaintiff suggests, but does not expressly argue, that the ALJ erred in her assessment of Dr. Gary Brazina's opinion as well. (*See* Joint Stip. at 7.) However, Dr. Brazina opined that Plaintiff could return to her usual and customary job without any restrictions. (AR 901; *see also id.* at 904.) Accordingly, to the extent that the ALJ may have erred in her evaluation of Dr. Brazina's opinion, the error is harmless because, even if she had adopted Dr. Brazina's opinion, it would not have resulted in a more restrictive RFC assessment or a determination of disability. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (an error is harmless if it is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the agency's path may reasonably be discerned'").

that Plaintiff mischaracterizes the ALJ's decision. (*See* Joint Stip. at 14-15.) The Court has completed its review of the record and now evaluates the adequacy of the ALJ's assessment of each of these physicians' opinions.

### 1. Opinion of Dr. Tabibian

#### a. Dr. Tabibian's Treatment Records

The record reflects that Dr. Behnam Sam Tabibian is a Diplomate of the American Board of Physical Medicine and Rehabilitation and certified by the California Division of Workers' Compensation to examine injured workers as a qualified medical evaluator ("QME"). (AR 686.) On May 6, 2014, Plaintiff saw Dr. Tabibian and was prescribed Naproxen, a nonsteroidal anti-inflammatory commonly known as Aleve. (AR 690.) On May 19, 2014, Plaintiff saw Dr. Tabibian for a follow up evaluation. (AR 687.) Dr. Tabibian observed no swelling or warmth but no significant improvement since her last visit. (AR 687.) Dr. Tabibian observed that Plaintiff's medial elbows were tender to palpation (AR 687) but observed no impaired range of motion in her elbows or wrists (AR 688). Dr. Tabibian performed a steroid injection in the area of Plaintiff's left common flexor tendon, based on the results of an ultrasound. (AR 688.) He opined that Plaintiff's "work status" was "modified work with the following restrictions: [Plaintiff] is restricted from repetitive pinching and grasping on both sides." (AR 689.)

On June 16, 2014, Plaintiff returned for a follow up evaluation. (AR 684.) With the exception of tenderness to palpation in Plaintiff's medial elbows, Dr. Tabibian made no other abnormal findings. (AR 684-85.) Dr. Tabibian requested authorization for chiropractic care for Plaintiff's shoulder and elbows and for an Electromyogram Test and Nerve Conduction Study (EMG/NCS). (AR 685.) He again opined that Plaintiff's "work status" was "modified work with the following restrictions: [Plaintiff] is restricted from repetitive pinching and

grasping on both sides." (AR 689.) A subsequent (August 8, 2016) electrodiagnostic study performed by Dr. Tabibian showed mild right carpal tunnel syndrome with no ulnar neuropathy or cervical radiculopathy. (*See* AR 1052.)

### b. ALJ's Decision

The ALJ found that, in June 2014, Dr. Tabibian had assessed "interim limitations" on Plaintiff's capacity to perform repetitive pinching and grasping (AR 23), but she discounted these limitations as being temporary and, further, assessed by a source who "cannot be considered impartial," lacked "disability program knowledge," and "did not share [the ME's] familiarity with the longitudinal medical evidence in this case." (AR 23.) The ALJ also found that "the opinion provided by [the ME] is more consistent with the record as a whole." (AR 23.) Finally, the ALJ suggested that Dr. Tabibian's opinion was not adequately supported by his own treatment records, according to which "[Plaintiff's] objective clinical presentation remained largely normal." (AR 20.) Specifically, the ALJ wrote that, although Plaintiff reported some tenderness at the elbows, "[Plaintiff] otherwise exhibited no tenderness to pressure over the joints, muscles, or bony and tendinous structures of the wrists, and she had full range of motion of both elbows and wrists in all directions." (AR 20.) For these reasons, the ALJ declined to adopt Dr. Tabibian's assessment that Plaintiff was unable to perform "repetitive pinching and grasping on both sides." (*See generally* AR 18.)

### c. Analysis

The ALJ articulated specific and legitimate reasons supported by substantial evidence in the record for discounting Dr. Tabibian's assessment. First, the ALJ is correct that Dr. Tabibian's treatment records do not support his opinion that Plaintiff is unable to perform repetitive pinching and grasping bilaterally. As the ALJ observed, Plaintiff's sole symptom was tenderness to palpation in her medial elbows. An ALJ may properly reject a treating

physician's conclusions that, like Dr. Tabibian's, are "conclusory and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) ("discrepancy" between treating physician's assessment and clinical notes is a clear and convincing reason for not relying on the doctor's opinion).

Second, the ALJ observed that Dr. Tabibian's opinion was inconsistent with the record. (*See* AR 23.) Although Plaintiff reported experiencing "grip weakness" and increased pain when "gripping [or] grasping," (*see*, *e.g.*, AR 1048), Dr. Tabibian was alone in finding that Plaintiff was *unable* to perform repetitive pinching and grasping bilaterally (*see*, *e.g.*, AR 931 (10/15/15 – Dr. Rubanenko opined that Plaintiff could not lift or carry over 20 pounds or perform repetitive flexion/extension of the head/neck but did not assess limitations on gripping, pinching, or fine manipulation), 1056 (9/21/2016 – Dr. Haronian opined that Plaintiff could not engage in lifting, pushing, or pulling over 10 pounds but did not assess limitations on gripping, pinching, or fine manipulation); 901 (4/18/2017 – Dr. Brazina opined that Plaintiff could return to her usual and customary job without <u>any</u> restrictions).) Similarly, the determination that Plaintiff suffers from mild carpal tunnel syndrome on the *right* cannot be reconciled with Dr. Tabibian's assessment of extreme limitations on *both* sides. Accordingly, the ALJ articulated at least two specific and legitimate reasons supported by substantial evidence in the record for declining to adopt Dr. Tabibian's opinion that Plaintiff was unable to perform "repetitive pinching and grasping on both sides." The ALJ's assessment of Dr. Tabibian's opinion is, therefore, AFFIRMED.

\\
\\
\\
\\
\\
\\

9

### 2. Opinion of Dr. Kohan

#### *a. Dr. Kohan's Treatment Records*

The record reflects that, on October 11, 2016, Jonathan F. Kohan, M.D., a Diplomate with the American Board of Anesthesiology, saw Plaintiff for an initial pain management consultation. (AR 1046.) Dr. Kohan reported that Plaintiff had undergone physical therapy and acupuncture but had remained symptomatic and had received a cortisone injection in the left elbow that provided temporary pain relief. (AR 1047.) In July 2016, Plaintiff was referred to Dr. Kohan after being advised that she was a candidate for cervical epidural injections. (AR 1047.) Dr. Kohan reviewed Plaintiff's medical records and diagnostic studies—namely, an August 11, 2014 MRI revealing disc bulges at C4-C5 and CF-C6 and August 8, 2016 electrodiagnostic studies revealing mild right carpal tunnel syndrome with no ulnar neuropathy or cervical radiculopathy. (AR 1052.)

At the initial consultation, Plaintiff reported that she was experiencing: neck pain and stiffness at the base of her neck radiating to both shoulders and upper extremities and down to her fingers; frequent headaches; bilateral shoulder pain aggravated by reaching and lifting; bilateral elbow pain extending down the forearm to her hand and fingers with difficulty lifting and carrying objects and rotating her arm; and bilateral hand/wrist pain with grip weakness and difficulty with fine motor coordination. (AR 1047-48.)

Dr. Kohan's physical examination of Plaintiff's cervical spine revealed no decreased range of motion but tenderness to palpation over paravertebral, trapezius, deltoid, and rhomboids area with severe spasm and tenderness over paraspinous muscles. (AR 1050.) Dr. Kohan also reported decreased sensation "in a patchy fashion" over the C6. (AR 1052-53.) Plaintiff exhibited no decreased range of motion in her shoulders but reported tenderness over the shoulder joint bilaterally. (AR 1051.) Plaintiff also exhibited no decreased range of

motion in her elbows but reported tenderness over the entire joint. (AR 1051.) Finally, Plaintiff exhibited no observable symptoms in her wrists. (AR 1051-52.) Dr. Kohan's diagnostic impressions were that Plaintiff suffered: cervical disc protrusions; cervical radiculopathy; bilateral shoulder tendinosis; bilateral elbow epicondylitis medial and lateral; and wrist tendinosis with reported history of carpal tunnel syndrome. (AR 1052.)

Dr. Kohan assessed no functional limitations and did not recommend a specific course of treatment. (*See generally* AR 1052-53.) Instead, Dr. Kohan found that Plaintiff "may be best considered for an updated MRI of the cervical spine area since her complaints in the neck and upper extremity have worsened significantly since 2014." (AR 1053.) Dr. Kohan also "reviewed . . . in more detail" the option of cervical epidural injection. (AR 1053.)

### b. ALJ's Decision

The ALJ described Dr. Kohan's report as reflecting "normal findings" with "some evidence of paracervical tenderness and spasm as well as some epicondyle tenderness" but a "normal" range of motion in Plaintiff's cervical spine with negative impingement signs. (AR 21.) The ALJ added that Dr. Kohan had determined that Plaintiff remained "entirely neurologically intact" with the exception of some decreased sensation "in a patchy fashion" over the C6 distribution. (AR 21.) The ALJ stated that Dr. Kohan's findings were consistent with the ALJ's own assessment of Plaintiff's residual functional capacity, *i.e.*, with the ALJ's determination that Plaintiff can: never lift overhead or push/pull more than 15 pounds occasionally; walk up to 45 minutes at a time and sit up to 60 minutes at a time; only occasionally reach overhead; and, *inter alia*, never engage in forceful use of the upper extremities and repetitive rotation of the head/neck. (AR 21.)

\\
\\
\\

*c. Analysis*

Although the ALJ did not expressly discuss Dr. Kohan's findings regarding Plaintiff's wrists and shoulders—namely, that Plaintiff exhibited tenderness but no decreased range of motion in her shoulders and elbows and no observable symptoms in her wrists (AR 1051-52)—Plaintiff has not identified any aspect of Dr. Kohan's report that the ALJ failed to credit. (*See generally* Joint Stip. at 6-9.) Indeed, the ALJ stated that Dr. Kohan's findings were consistent with her assessment of Plaintiff's RFC (AR 21), an assertion that Plaintiff has failed to undermine. (*See generally* Joint Stip. at 6-9.)

As stated above, Dr. Kohan assessed no functional limitations and did not recommend a specific course of treatment. (*See generally* AR 1052-53.) Instead, Dr. Kohan found that Plaintiff "may be best considered for an updated MRI of the cervical spine." (AR 1053.) In light of the foregoing, the Court finds the ALJ did not discount any portion of Dr. Kohan's report, and, therefore, the ALJ did not err in her assessment of Dr. Kohan's findings and opinions. The ALJ's assessment of Dr. Kohan's opinion is, therefore, AFFIRMED.

## 3. Opinion of Dr. Haronian

*a. Dr. Haronian's Treatment Records*

The record contains extensive records from Dr. Edwin Haronian, a certified Diplomate with the American Board of Orthopedic Surgery and Fellow with the American Academy of Orthopedic Surgeons, reflecting treatment Plaintiff received between July 19, 2016 and August 2, 2017. (AR 990-1072.) At Plaintiff's initial orthopedic evaluation with Dr. Haronian on July 7, 2016, Plaintiff complained of: constant aching in her neck that occasionally became sharp and shooting; pain traveling down her arms and hands, with episodes of numbness and tingling in her arms and hands—usually at night; frequent headaches; neck stiffness; constant

aching in her shoulders that became sharp and throbbing with activity; a grinding sensation in her shoulders; constant aching in her elbows that became sharp and stabbing with pushing, pulling, and lifting; constant aching in her wrists/hands that becomes sharp, shooting, and burning with activity; swelling, numbness, and tingling in her hands and fingers—usually at night; clicking in her fingers; cramping and weakness in her hands resulting in "dropp[ing] several objects"; and increased pain in her hands and fingers with gripping, grasping, and repetitive hand and finger movements. (AR 1064-65.) Plaintiff reported that, because of these symptoms, Plaintiff had difficulty showering, dressing, grooming, and performing house chores, and, further, avoided standing, walking, sitting, and driving for prolonged periods of time. (AR 1066.)

On physical examination, Dr. Haronian observed spasm and tenderness over the paravertebral musculature, tenderness at the acromioclavicular joint bilaterally, tenderness over the medial (Golfers) epicondyle bilaterally, and tenderness over Plaintiff's 4th and 5th digits bilaterally. (AR 1066, 1067, 1069.) No other areas of tenderness or spasm were observed. (AR 1066, 1067.) Plaintiff's grip strength appeared reduced. (*See* AR 1067.) Plaintiff had positive impingement and Hawkins signs on the right and left shoulders and positive Phalen and reverse Phalen testing in her wrists bilaterally. (AR 1068.) Plaintiff's reflexes and motor power testing was normal, except for reduced motor power in Plaintiff's Deltoid (C5) muscle group. (AR 1067.) Plaintiff's sensory testing was also normal, except for decreased sensation with pain in the Deltoid (C5) area. (AR 1067.)

Dr. Haronian reviewed x-rays of Plaintiff's cervical spine, which showed AC joint osteoarthritis and straightening of her cervical lordotic curvature with a mild anterolisthesis of C4 on C5 measuring 1 to 2 mm. (AR 1069.) Dr. Haronian also reviewed August 2014 MRIs of Plaintiff's cervical spine, which showed significant posterior disc bulges at C4-C5 and C5-C6 and, to a lesser extent, C6-C7. (AR 1069.)

Dr. Haronian diagnosed Plaintiff with:  cervical radiculopathy; bilateral shoulder impingement; bilateral elbow tendonitis/bursitis; and bilateral wrist tendonitis/bursitis.  (AR 1069.)  Dr. Haronian stated that, in his opinion, Plaintiff could return to her prior work with the following restrictions:  avoid lifting over 10 pounds; and avoid pushing or pulling over 10 pounds.  (AR 1071, 1074.)  However, Dr. Haronian also stated that he would defer to the contradictory opinion of Dr. Rubanenko about Plaintiff's ability to return to work and reserved the right to assess additional or fewer work restrictions in the future.  (AR 1071.)

At a subsequent appointment on September 4, 2016, Dr. Haronian recommended an evaluation by pain management for epidural steroid injections.  (AR 1056.)  However, Dr. Haronian made no changes to his July 2016 opinion that Plaintiff could return to "modified work activities," with the following limitations:  avoid lifting over 10 pounds; and avoid pushing and pulling over 10 pounds.  (AR 1056.)

At a subsequent appointment on October 13, 2016, Dr. Haronian requested authorization for an updated cervical MRI study and an MRI of Plaintiff's left shoulder.  (AR 1043-44.)  However, Dr. Haronian again made no changes to his July 2016 opinion that Plaintiff could return to "modified work activities," with the following limitations:  avoid lifting over 10 pounds; and avoid pushing and pulling over 10 pounds.  (AR 1044-45.)

In November 18, 2016, Dr. Haronian indicated that Plaintiff's physical examination was unchanged, epidural injections had been requested but were pending MRI studies, and home exercises had been recommended.  (AR 1041.)  He made no changes to his assessment of Plaintiff's functional limitations.  (AR 1042.)

In the December 13, 2016 Medical Legal Report cited by Plaintiff, Dr. Haronian reviewed approximately 22 months-worth of treatment records from Plaintiff's prior treating physician, Dr. Gabriel V. Rubanenko, among other treating and examining physicians.  (AR

14

1007-1038; *see also* Joint Stip. at 6-7.)  Dr. Haronian did not express an opinion regarding Plaintiff's functional limitations in this report.  (*See generally* AR 1007-1039.)

At Plaintiff's 2017 appointments, Dr. Haronian continued to opine that Plaintiff could work with the following limitations:  avoid lifting over 10 pounds; and avoid pushing and pulling over 10 pounds.  (*See, e.g.*, AR 997 (Apr. 19, 2017), 1000 (Mar. 2, 2017), 1004 (Feb. 2, 2017), 1006 (Jan. 5, 2017).)  At Plaintiff's final examination with Dr. Haronian, on August 2, 2017, Dr. Haronian indicated that Plaintiff continued to have the following symptoms upon physical examination:  tenderness, guarding, and spasm in the paravertebral muscles of her cervical and lumbar spines with decreased range of motion in flexion and extension; dysesthesia in C6 and C7 dermatomal distributions; and tenderness in the paravertebral muscles of her lumbar spine with dysesthesia in the left L5 and S1 dermatomal distributions. (AR 990-91.)  Dr. Haronian stated that he was encouraging Plaintiff to continue with physical therapy to "cure and relieve the effects of her industrial injury to her cervical and lumbar spines."  (AR 991.)  He stated that his assessment of Plaintiff's work restrictions was "unchanged" (AR 991), indicating his continued endorsement of the view that Plaintiff could return to "modified work activities," with the following limitations:  avoid lifting over 10 pounds; and avoid pushing and pulling over 10 pounds.  Finally, Dr. Haronian listed Plaintiff's diagnoses as the following:  impingement syndrome of both shoulders; and medial epicondylitis of both elbows.  (AR 991.)

### b.  ALJ's Decision

The ALJ  acknowledged that Dr. Haronian had opined that Plaintiff could perform modified work with a restriction to avoid pushing, pulling, or lifting over 10 pounds.  (AR 23.) However, the ALJ stated that Dr. Haronian's opinion could not be considered impartial "given the adversarial context in which their assessments were generated," and added that Dr. Haronian did not have disability program knowledge and "did not share the Medical Expert's

15

familiarity with the longitudinal medical evidence in [Plaintiff's] case." (AR 23.) The ALJ also suggested that Dr. Haronian's opinion assessed only "interim limitations." (AR 23.) Finally, the ALJ stated that the Medical Expert's opinion was "more consistent with the record as a whole." (AR 23.) Based on the foregoing, the ALJ declined to credit Dr. Haronian's opinion that Plaintiff was unable to push, pull, or lift more than 10 pounds. (*See* AR 18, 23.)

### c. *Analysis*

The ALJ's decision suggests that the primary reason she discounted Dr. Haronian's assessment of Plaintiff's functional limitations is that Dr. Haronian made the assessment in the context of Plaintiff's claim for workers' compensation—a program that is distinct, and uses different terminology, from the federal disability benefits programs managed by the Commissioner. (*See* AR 23.) State workers' compensation disability ratings are not controlling in disability cases decided under the Social Security Act. *Knorr v. Berryhill*, 254 F.Supp.3d 1196, 1212 (C.D. Cal. 2017) (citing *Booth v. Barnhart*, 181 F.Supp.2d 1099, 1104 (C.D. Cal. 2002)). Nevertheless, the ALJ may not ignore these ratings completely and, instead, is required to "translate" terms of art contained in medical opinions issued in the workers' compensation context to assess the implications of those opinions for the Social Security disability determination. *See id.* Without more, "the purpose for which an opinion is provided is not a legitimate basis for evaluating the reliability of the report." *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998). Instead, the ALJ must look not only at the circumstances in which the report was obtained "and its consistency with other records, reports, or findings" to evaluate its reliability. *Id.* Accordingly, the Ninth Circuit has rejected the view that a physician is biased, and his opinion should be discounted, solely because he was hired in the context of a workers' compensation claim. *See Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1196 n. 5 (9th Cir. 2004); *see also Iatridis v. Astrue*, 501 F. Supp. 2d 1267, 1277 (C.D. Cal. 2007) (finding that the ALJ erred in discounting a treating physician's opinion on the basis that he was "a workers' compensation physician"). In light of this case law,

neither the context in which Dr. Haronian's opinion was generated nor his purported lack of knowledge about disability cases decided under the Social Security Act were specific and legitimate reasons supported by substantial evidence for discounting Dr. Haronian's opinion.

The Court finds equally questionable the ALJ's characterization of Dr. Haronian's limitations as "interim" and her determination that Dr. Levine had greater familiarity with the longitudinal record than Dr. Haronian. Nevertheless, there is substantial evidence in the record to support the ALJ's determination that the ME's opinion that Plaintiff was capable of "lifting and carrying occasionally 20 pounds, frequently 10, but should not be lifting above the shoulder level" and "occasionally push[ing] or pull[ing] 15 pounds" was more consistent with the record as a whole than Dr. Haronian's opinion that Plaintiff was unable to lift, push, or pull more than 10 pounds. (AR 23.)

On an Adult Activities Questionnaire that Plaintiff completed on April 3, 2015, Plaintiff indicated that she was able to lift laundry and "some groceries" and was also able to carry her purse every day. (AR 207.) She did not identify a maximum amount she could lift or an object that was too heavy for her to lift, carry, push, or pull. (*See generally id.*) Motor power testing from that same month was normal, with no deficit in any of Plaintiff's major muscle groups. (AR 320.) Plaintiff's sensation was also normal and only mild muscle spasms were observed in the lumbar spine. (AR 320.) A Medical Legal Physical Performance Functional Capacity Evaluation performed later that year, on September 17, 2014, assessed no limitations in Plaintiff's ability to push or pull but determined that Plaintiff should not lift more than 10 pounds for more than eight hours a day. (AR 328.)

Records reflecting chiropractic treatment in the first half of 2015 indicate that Plaintiff made inconsistent reports about the parts of her body that were in pain, and the chiropractor's assessment of functional limitations was also inconsistent. (*See* AR 272-319; *compare* AR 272-77 (at appointments in May and June 2015, Plaintiff complains of pain in her elbows but

not her shoulders or cervical spine) *with id.* 300-06 (at an April 2015 appointment, Plaintiff complains of moderate pain in her cervical spine and upper extremities, including her shoulders, but not specifically her elbows, and the chiropractor assesses no functional limitations) *and id.* 346-51 (at February 17, 2015 appointment, Plaintiff complains of moderate pain in her cervical spine and upper extremities, including her shoulders, but not specifically her elbows, and the chiropractor assesses limitations on Plaintiff's use of her *left* shoulder but nor her right).)

On July 9, 2015, Plaintiff completed a form in connection with a pain management appointment on which she indicated that she was able to lift 20 pounds "with some difficulty" and 30 pounds "with much difficulty." (AR 728.) That same month, at a consultative orthopedic examination with Richard Pollis, M.D., a board-certified orthopedic surgeon, Plaintiff similarly reported that she could lift up to 20 ponds. (AR 742.) Following a physical examination, Dr. Pollis observed that Plaintiff retained 5/5 strength in Plaintiff's muscle groups in her upper extremities and exhibited no muscle atrophy in her shoulders, although there was tenderness to palpation, paravertebral muscle tenderness, and spasm. (AR 743-45.) Dr. Pollis opined that Plaintiff retained the capacity to lift and carry 20 pounds occasionally and 10 pounds frequently with no limitations for pushing and pulling beyond those assessed for lifting and carrying. (AR 746.)

On October 15, 2015, Plaintiff reported to Dr. Gabriel V. Rubanenko that she experienced increased pain with repetitive lifting, carrying, and pushing or pulling of more than 15 pounds. (AR 1024-25.) However, a February 4, 2016 Medical-Legal Physical Performance Functional Capacity Evaluation ("FCE") assessed no limitations on Plaintiff's ability to push, pull, lift, or carry during an average workday. (AR 1034-35.) Later that year, at Plaintiff's July 7, 2016 orthopedic evaluation with Dr. Haronian, Plaintiff's reflexes and motor power testing was normal, except for mildly reduced motor power in Plaintiff's Deltoid (C5) muscle group. (AR 1067.)

In April 2017, nine months after Plaintiff's initial evaluation by Dr. Haronian, Dr. Gary Brazina, a board-certified orthopedic surgeon, evaluated Plaintiff in connection with her workers' compensation claim and reviewed all of her medical records. (AR 875.) He observed that, although Plaintiff retained a full range of motion in her shoulders, she also complained of persistent pain in her shoulders, and her x-rays showed evidence of impingement syndrome in her shoulders. (AR 901.) Dr. Brazina also observed sensory deficits along the ulnar border of Plaintiff's left upper extremity. (AR 901.) Based on his in-person examination of Plaintiff and review of her records, he determined that Plaintiff could return to her usual and customary job without <u>any</u> restrictions. (AR 901; *see also id*. at 904.)

Having reviewed Plaintiff's subjective descriptions of her condition during the alleged period of disability as well as the objective findings and functional assessments of numerous physicians, the Court finds that the evidence in the record concerning Plaintiff's ability to lift, carry, push, and pull "is susceptible to more than one rational interpretation." *See Molina*, 674 F.3d at 1110. Consequently, although Plaintiff's interpretation of the evidence is viable, the ALJ's finding that the record is more consistent with the ME's opinion than with Dr. Haronian's is supported by inferences reasonably drawn from the record, and, therefore, the ALJ's evaluation of Dr. Haronian's opinion must be AFFIRMED. *See id.*

**4. Opinion of Dr. Rubanenko**

*a. Dr. Rubanenko's Treatment Records*

The last medical opinion at issue is that of Dr. Gabriel V. Rubanenko, a Diplomate of the American Board of Orthopaedic Surgery. (*See* Joint Stip. at 7; AR 759.) The record reflects that Plaintiff received almost monthly treatment with Dr. Rubanenko from August 7, 2014 through September 3, 2015. (AR 759-821.) Additionally, on October 15, 2015, Dr. Rubanenko opined that Plaintiff was "permanent and stationary," *i.e.*, that her condition had

stabilized and was unlikely to improve, and he assessed the following functional limitations: "no lifting/carrying over 20 pounds" and "no repetitive flexion/extension of the head/neck." (AR 931.) At no point during the previous year of treatment did Dr. Rubanenko assess any functional limitations. (*See generally* AR 759-821.)

### b. ALJ's Decision

The ALJ determined that Plaintiff could never lift, push, or pull more than 15 pounds occasionally and was precluded from "repetitive rotation of the head/neck." (AR 18.) In reaching this conclusion, the ALJ necessarily found that Dr. Rubanenko's weight limitation was not sufficiently restrictive but also discounted his assessment of a limitation on repetitive "flexion/extension" of Plaintiff's head and neck. (*See generally* AR 18.) Nevertheless, the ALJ characterized Dr. Rubanenko's opinion as "essentially consistent" with her own RFC assessment. (AR 23.) The ALJ did not provide any additional explanation for her decision to discount Dr. Rubanenko's opinion. (*See generally id.*)

### c. Analysis

In effect, the ALJ's only reason for discounting Dr. Rubanenko's opinion that Plaintiff was precluded from repetitive flexion/extension of her head/neck was that she had adopted it, a statement that is belied by the dictionary definitions of "flexion," "extension," and "rotation." The Merriam Webster Dictionary, for example, defines "flexion" as "the act of flexing or bending;" "extension" as the "the action of extending" or "an unbending movement;" and "rotation" as "the action or process of rotating" or "turning of a body part about its long axis as if on a pivot." Additionally, Plaintiff indicated on a check-the-box form completed on July 9, 2015 that her pain was exacerbated both by "looking over the shoulder" and "looking up," suggesting that both neck extension *and* neck rotation caused pain. (*See* AR 727.)

Defendant nevertheless contends that it is wholly "speculative" that limitations on "flexion/extension" and "rotation" are limitations on two different types of movements. (Joint Stip. at 15.) The Court is baffled by Defendant's argument.

The law requires the ALJ to assess the medical opinions and make findings supported by substantial evidence in the record. *See Trevizo*, 871 F.3d at 675. Defendant has pointed to no evidence in the record that a limitation on "flexion/extension" is the same as a limitation on "rotation," and the Court is aware of none. Accordingly, there is not substantial evidence in the record to support the ALJ's finding that the limitations assessed by Dr. Rubanenko and the ALJ are "consistent," and, as a result, the ALJ erred by discounting a portion of Dr. Rubanenko's opinion without explanation. *See Garrison*, 759 F.3d at 1012-13 (an ALJ errs when he discounts a treating or examining physician's medical opinion, or a portion thereof, "while doing nothing more than ignoring it").

Nevertheless, the Court agrees with Defendant that the adoption of a limitation on repetitive flexion/extension of Plaintiff's head/neck would not undermine the ALJ's nondisability determination. (*See* Joint Stip. at 15.) The VE testified that Plaintiff remained able to perform her past past relevant work, which was "neck neutral" and did not involve "repetitive neck movements" generally. (AR 61.) Accordingly, even if the ALJ had adopted Dr. Rubanenko's opinion that Plaintiff was unable to perform repetitive flexion/extension of her head/neck, she would not have reached a different result because there is substantial evidence in the record that Plaintiff could still perform her past relevant work. *See Brown-Hunter*, 806 F.3d at 492. Therefore, the Court finds that, although the ALJ erred in her assessment of Dr. Rubanenko's opinion, the error is harmless, and, on that basis, the ALJ's evaluation of Dr. Rubanenko's opinion is AFFIRMED.

\\
\\
\\

II.     **The ALJ's Assessment of Plaintiff's Statements About her Symptoms and Limitations**

   A. **Plaintiff's Statements**

   The second issue in dispute is whether the ALJ erred in her assessment of Plaintiff's statements about her symptoms and limitations. (Joint Stip. at 4.) There are several sources of Plaintiff's statements about her subjective symptoms and functional limitations. First, on April 3, 2015, Plaintiff completed an Exertion Questionnaire. (AR 206-08.) Plaintiff indicated that she was experiencing pain in her neck, shoulders, elbows, wrists, fingers, and low back. (AR 206.) Although she was no longer working as a film inspector in 2015, she stated on the Exertion Questionnaire that, in an average day, she rewound film reels from left to right, which required her to put pressure on her left side and lift up her arms. (AR 206.) She stated that walking for 40 minutes to an hour felt good (AR 206) and indicated that she had no difficulty getting eight hours of sleep a night without naps or rest periods during the day (AR 208). She stated that she was able to lift the laundry and groceries, actions she performed every two to three days. (AR 207.) She stated that she carried her purse every day. (AR 207.) She stated that she did not clean her own home or perform yard work—and also had not performed these activities before she became disabled—but does drive 30 miles a day. (AR 207-08.) She stated that pain makes it difficult to complete housework. (AR 208.) She stated that she takes Naproxen, a nonsteroidal anti-inflammatory drug commonly known as Aleve, Cyclobenzaprine, a muscle relaxant, and Tramadol, a highly addictive narcotic, for her condition. (AR 208.) She stated that she also uses a brace when she is resting at home. (AR 208.)

   On July 9, 2015, Plaintiff completed a check the box form for her initial evaluation with Dr. Amir Friedman, a pain management specialist. (*See* AR 727.) Plaintiff reported that she experienced pain 100% of the time in the back of her neck, radiating to her head and upper

back bilaterally. (AR 727.) She reported that she also experienced numbness. (AR 727.) She stated that, at best, her pain was a 5 on a scale of 1 to 10 (with 10 being the worst) and, at worst, her pain was an 8-9. (AR 727.) She stated that stress, "looking up," "looking over the shoulder," and "overhead work" made her pain worse. (AR 727.) Plaintiff stated that, "with some difficulty," she remained able to do activities of self-care and personal hygiene as well as perform outdoor work, light housework, shopping, grocery carrying, and lifting 10-20 pounds. (AR 728.) She stated that she could lift 30 pounds "with much difficulty." (AR 728.)

On July 25, 2015, Plaintiff reported to Dr. Pollis that she had progressive spinal pain, spasm, and stiffness as well as bilateral shoulder pain, particularly with repetitive use. (AR 741.) She stated that she needed to sit down after standing or walking for one hour at a time, could lift up to 20 pounds, and changed position after sitting for one hour. (AR 742.) She reported that she was taking multiple nonsteroidal anti-inflammatories (Ibuprofen and Flurbiprofen) and multiple muscle relaxants (Cyclobenzaprine and Baclofen) as well as Dexamethasone for inflammation. (AR 742.)

On April 18, 2017, Plaintiff reported to Dr. Gary E. Brazina, an orthopedic surgeon, that she began developing pain in 2008 or 2009, which progressively worsened. (AR 877-78.) Plaintiff did not report her pain and symptoms to her employer because she feared termination, but she tried pain medication and anti-inflammatory agents, physical therapy, and an injection to her left elbow. (AR 878.) In October 2013, she was laid off. (AR 878.) She continued to be treated with pain medication and anti-inflammatory agents, was supplied a set of wrist supports, and received another injection in her left elbow. (AR 878.) In June 2014, Plaintiff was referred for acupuncture and an additional course of physical therapy. (AR 878.) She also received a Cortisone injection in her left shoulder later that year. (AR 879.) Plaintiff complained to Dr. Brazina of constant aching in her neck, which was aggravated by prolonged sitting and lifting and radiated to her arms and hands, where she experienced numbness and tingling. (AR 880.) She complained of frequent headaches that she associated with her neck

pain as well as neck stiffness and muscle spasms. (AR 880.) She stated that she had difficulty sleeping. (AR 880.) She stated that her shoulder pain increased with reaching, pushing, pulling, and lifting and, *inter alia*, she experienced swelling, numbness, tingling, cramping, and weakness in her hands. (AR 881.) She stated that she could walk no more than half a mile but had no difficulty climbing a flight of stairs. (AR 882.) She stated that she had "some difficulty" standing or walking for 30 minutes to an hour and sitting for two hours. (AR 882.) She stated that she had "a lot of difficulty" standing or walking for two hours, pushing, pulling, typing, performing forceful activities with her arms or hands, kneeling, and squatting. (AR 882.) She stated that her pain did not interfere with her ability to engage in social activities. (AR 882.)

At the October 11, 2017 hearing, Plaintiff testified that she stopped working in October 2013 and went on unemployment. (AR 52.) She testified that her arms were in continuous pain for the five or six years before she lost her job in October 2013. (AR 54.) She testified that she experienced numbness running from her elbow to her fingers bilaterally. (AR 35.) She testified that she was able to drive three days a week but experienced pain "open[ing] the door," "put[ting] the keys in the ignition," and "steer[ing] the steering wheel with [her] arms and hands." (AR 36.) She testified that, although it was painful, she could lift a gallon of milk from the shelf into a grocery cart. (AR 36.) She testified that she was able to dress herself and button up buttons and zip zippers but experienced "a little bit of a hard time" putting on her shoes and socks. (AR 37.) She testified that she was able to pull a t-shirt over her head. (AR 37.) She testified that she did "a little" cooking and helped her daughter with the dusting of furniture and cleaning the bathroom. (AR 38.) She testified that she did not do the laundry but, so long as the strength in her arms and fingers did not leave her, was able to rinse a dish and put it in the dishwasher. (AR 38.) She testified that she was able to put dishes in the cabinets "little by little." (AR 38.) She testified that she could walk for up to two hours at a time but that her feet went numb if she was standing in one place. (AR 56.) She testified that

she could sit for no more than an hour and a half at a time. (AR 58.) She testified that she was in "moderate" pain most of the day and moving her arms intensified her pain. (AR 58.)

**B. ALJ's Decision**

The ALJ found that, although Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (AR 19.) The ALJ explained that the objective medical findings "do not substantiate [Plaintiff's] alleged inability to do any/all work." (AR 21; *see also id.* at 22 ("the preponderance of the medical opinion evidence of record" is at odds with the allegations of totally disabling symptoms).) The ALJ also found that Plaintiff's course of treatment was inconsistent with the degree of disability alleged. (AR 21.) The ALJ also observed that Plaintiff had stopped working for non-medical reasons (she was laid off) and had "demonstrably managed to do her job" despite her impairments for many years. (AR 21.) Finally, the ALJ stated that Plaintiff's own statements and activities during the alleged period of disability cast doubt on her claim of disabling symptoms since the alleged onset date and revealed that she really only experienced difficulty with "forceful activities." (AR 22.)

**C. Applicable Law**

An ALJ must make two findings before discounting a claimant's statements regarding the severity and persistence of her symptoms. *See Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). "Second, if the claimant has produced that evidence, and the ALJ has not determined that the

claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms" and those reasons must be supported by substantial evidence in the record. *Id.*; *see also Marsh v. Colvin*, 792 F.3d 1170, 1174 n.2 (9th Cir. 2015); *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1161 (9th Cir. 2008) (court must determine "whether the ALJ's adverse credibility finding . . . is supported by substantial evidence under the clear and convincing standard").

In March 2016, the Commissioner promulgated Social Security Ruling ("SSR") 16-3p, which "makes clear what [Ninth Circuit] precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms' . . . and not to delve into wide ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017). Under SSR 16-3p, the ALJ shall determine whether to credit a claimant's statements about her pain and limitations by referring to the factors set forth in 20 C.F.R. § 404.1529(c)(3), which include: the claimant's daily activities; the factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; the claimant's treatment, other than medication, for the symptoms; any other measure that the individual uses to relieve pain or other symptoms; and, finally, "any other factors concerning an individual's functional imitations and restrictions." SSR 16-3p.

**D. Analysis**

The ALJ provided the requisite clear and convincing reasons supported by substantial evidence in the record for declining to credit Plaintiff's statements about her symptoms and limitations in full.

First, although Plaintiff contends that "the reason for separation from her job was not a valid basis for discounting [Plaintiff's] complaints and testimony," she cites no case law in

26

support of this proposition (*see generally* Joint Stip. at 18), and it is well-established in the Ninth Circuit that a plaintiff's reason for leaving a job is a legitimate reason for disregarding the plaintiff's statements about disabling symptoms and limitations. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001); *Moon v. Colvin*, 139 F. Supp. 3d 1211, 1221 (D. Or. 2015) ("A claimant's reason for leaving employment is a valid consideration"); *Hunt v. Colvin*, 954 F. Supp. 2d 1181, 1194 (W.D. Wash. 2013).

Here, Plaintiff testified that she was able to perform her past relevant work for five to six *years* despite the onset of her condition and left her job only because she was laid off—not because her work had become too physically demanding or her condition disabling. (*See* AR 53-54.) Additionally, although Plaintiff was able to work for five to six years after the onset of her condition, she testified that she did not try to perform any other job after she was laid off because she did not think she would be able to function in another job. (AR 53.) Nevertheless, Plaintiff held herself out as being able to work by applying for and receiving unemployment benefits for six months after her termination, in addition to her severance pay. (AR 52, 53; *see also id.* at 1034 (Plaintiff received unemployment benefits for six months following her alleged onset date during which time she claimed she was looking for work)); *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014) ("Continued receipt of unemployment benefits . . . shows that an applicant holds himself out as capable of working."). Plaintiff's receipt of unemployment benefits after the alleged onset date, like her ability to perform her past relevant work for six years *after* the onset of her symptoms, undermines her allegation that she was disabled after the alleged onset date and did not believe she would be able to function in another job. *See Carmickle*, 533 F.3d at 1161-62 (citing *Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988)); *Williams v. Colvin*, 24 F. Supp.3d 901, 916 (N.D. Cal. 2014); *see also Ghanim*, 763 F.3d at 1165.

The Court also finds convincing the ALJ's finding that Plaintiff's subjective symptom complaints were inconsistent with the objective evidence in the record and the course of

treatment she pursued. In particular, the Court notes that Plaintiff's statements about her condition suggest that it worsened significantly between the first half of 2015, when she completed the Exertion Questionnaire and saw Dr. Pollis for a consultative evaluation, and 2017, when she saw Dr. Brazina in connection with her workers' compensation claim and testified before the ALJ. (*Compare, e.g.,* AR 208 (2015 – no difficulty getting eight hours of sleep a night) *with* AR 880 (2017 – has difficulty sleeping) *and* AR 741 (2015 – describes symptoms as limited to spine and shoulder pain but reports no pain or symptoms in her arms and hands and no headaches) *with* AR 880 (2017 – describes symptoms as shoulder and neck pain as well as pain radiating to her arms and hands, numbness and tingling in her hands, and frequent headaches) *and* AR 742 (2015 – she can lift up to 20 pounds) *with* AR 36 (2017 – it is painful for Plaintiff to lift a gallon of milk from the shelf and place it in a grocery cart).) However, Plaintiff's treatment records, statements to her medical providers, and results on physical examinations do not corroborate Plaintiff's allegations that her condition worsened significantly during this period.

To the contrary, during the approximately nine-month period between the end of Plaintiff's treatment with Dr. Rubanenko in October 2015 and the date she commenced treatment with Dr. Haronian (July 2016), there are no records of Plaintiff either receiving or seeking out *any* treatment for her complaints of debilitating pain, numbness, weakness, and tingling in her spine and upper extremities. (*See generally* AR 1024-1038); *see also* SSR 16-3p; *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (a plaintiff's "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" is a valid reason for discounting the plaintiff's subjective complaints); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (an ALJ may reject plaintiff's testimony of disabling limitations or pain if plaintiff failed to seek treatment or follow a prescribed course of treatment without a good reason).

Further, the record shows that Dr. Edwin Haronian treated Plaintiff between July 19, 2016 and August 2, 2017 (AR 990-1072) but did not identify significant worsening in her condition. To the contrary, Plaintiff's subjective complaints to Dr. Haronian, the results of her physical examinations, and Dr. Haronian's assessment of Plaintiff's functional limitations remained the same throughout that year-long period. (*See generally* AR 990-1072.) The lack of objective medical evidence supporting Plaintiff's allegations cannot provide the only basis to reject her statements about her symptoms and limitations. *Trevizo*, 871 F.3d at 679 (internal quotation marks and citation omitted). However, where, as here, the ALJ articulated other clear and convincing reasons supported by substantial evidence in the record in support of her assessment of Plaintiff's statements, the ALJ properly relied upon the inconsistency between Plaintiff's statements and the objective medical evidence as an *additional* reason for declining to adopt Plaintiff's statements in full. *See* SSR 16-3p; *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *Christine G. v. Saul*, 402 F. Supp. 3d 913, 923 (C.D. Cal. 2019).

Accordingly, there is substantial evidence in the record to support the ALJ's findings that the objective medical evidence did not corroborate Plaintiff's subjective complaints and Plaintiff had a nonmedical reason for leaving her job, was able to perform her job for several years after the onset of her condition, and did not receive the type of treatment one would expect given her allegations of debilitating, and progressively worsening, impairments. These findings are all valid reasons for the ALJ's decision not to credit Plaintiff's statements about her symptoms and limitations in full. The ALJ's decision is further buttressed by Plaintiff's receipt of unemployment benefits for six months after the alleged onset date. In light of the foregoing, the ALJ's evaluation of Plaintiff's statements about her symptoms and limitations is AFFIRMED.

\\
\\
\\
\\

III.    **The ALJ's Determination that Plaintiff Could Perform her Past Relevant Work**

    **A. Applicable Law**

    At step four of the sequential analysis, the claimant has the burden to prove that she cannot perform her prior relevant work "either as actually performed or as generally performed in the national economy." *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir. 2002). The ALJ's assessment of the claimant's RFC is used at step four (and, where relevant, step five) to determine whether the claimant is capable of performing her previous occupation, or, if not, any other jobs in the national economy. *Palomares v. Astrue*, 887 F. Supp. 2d 906, 919 (N.D. Cal. 2012). However, when the ALJ fails to present the VE with an RFC assessment that encompasses all of the claimant's limitations, the VE's testimony based on that RFC does not provide substantial evidence to support the ALJ's determinations regarding the claimant's ability to perform her past relevant work and/or other jobs in the national economy. *See Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1235 (9th Cir. 2011); *Palomares*, 887 F. Supp. 2d at 919.

    Plaintiff contends that the ALJ erred in finding that Plaintiff was able to perform her past relevant work because she relied on VE testimony that was based on an incomplete RFC. (*See* Joint Stip. at 26.) Specifically, Plaintiff contends that the VE did not have the opportunity to consider whether Plaintiff could perform her past relevant work if she was unable to perform "forceful grip, grasp, torque, or pinch activities."[5] (Joint Stip. at 26.) However, Plaintiff's contention is not supported by the transcript of the administrative hearing.

---

[5]    Elsewhere in the Joint Stipulation, Plaintiff contends that the ALJ erred by relying on the VE's testimony because the VE failed to explain "how Plaintiff could perform the job [of film inspector] if she needed to avoid repetitive, forceful use of the hands, fingers, and arms." (Joint Stip. at 26.) However, the ALJ did not find that Plaintiff needed to avoid "*repetitive,* forceful use of the hands, fingers and arms," only "forceful use of the upper extremities," which included "gripping, grasping, torqueing." (*Compare* Joint Stip. at 26 *with* AR 18.) The ME also did not opine that Plaintiff should avoid "*repetitive,* forceful use of the hands, fingers and arms," only "*forceful* grip, grasp, torque, or pinch activities of both upper extremities." (*Compare* Joint Stip. at 26 (emphasis added) *with* AR 47-48 (emphasis added).) It therefore appears

## B. Factual Background

As stated above, Plaintiff previously worked as a "negative assembler," which the VE classified as a film inspector (DOT 976.362-010). (AR 23, 201, 264.) The ALJ determined that Plaintiff retained the functional capacity to perform light work except she could "never lift overhead or push/pull more than 15 pounds occasionally" and, *inter alia*, "she is precluded from forceful use of the upper extremities and repetitive rotation of the head/neck." (AR 18.) The ALJ asked the VE whether a hypothetical individual of Plaintiff's age, education, and past work history who was capable of light work, including lifting or carrying up to 20 pounds at a time, with some restrictions, including, *inter alia*, "no lifting over the shoulder" and "no forceful use of her upper extremities as in gripping, grasping, torqueing" could perform Plaintiff's past relevant work as a film inspector. (AR 59.) The VE opined that the hypothetical person described by the ALJ could "definitely" perform the job of film inspector as it is described in the DOT and "somewhat" as Plaintiff actually performed it. (AR 59-60.)

Plaintiff's attorney then asked the VE if his answer would change if the hypothetical person was limited to only "occasional use of her arms for grabbing, pushing/pulling, lifting." (AR 60.) "Are you limiting the *weight* or the *amount* that she's lifting?" asked the VE. (AR 60 (emphasis added).) "[O]ccasional use with the 20 pounds," Plaintiff's counsel answered. (AR 60.) The VE responded that, with this additional limitation, Plaintiff would be unable to perform her past work as a film inspector. (AR 60.) Plaintiff's counsel then asked whether the hypothetical person described by the ALJ would be able to perform Plaintiff's past work as a film inspector if she was limited to lifting no more than 10 pounds. (AR 60.) The VE again answered in the negative. (AR 61.)

\\
\\

---

that Plaintiff has either misunderstood or mischaracterized the ALJ's RFC finding and the ME's testimony as including a limitation on "repetitive" forceful use of the upper extremities.

### C. Analysis

Having reviewed the record, the Court finds that Plaintiff's argument misstates the record. The ALJ expressly asked the VE whether a hypothetical individual who was, in all occupational aspects, identical to Plaintiff could perform Plaintiff's past relevant work if she was unable to engage in the "forceful use of her upper extremities as in gripping, grasping, torqueing," and the VE answered affirmatively. The ALJ therefore presented a complete RFC assessment to the VE and was entitled to rely on the VE's response to support her determination that Plaintiff could perform her past relevant work. Accordingly, based on the argument that Plaintiff has presented to the Court, the Court finds no error with the ALJ's determination that Plaintiff was able to perform her past relevant work, and the ALJ's finding at step four is AFFIRMED.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

**CONCLUSION**

The Court finds that the Commissioner's decision is supported by substantial evidence and free from material legal error. Neither reversal of the ALJ's decision nor remand is warranted.

Accordingly, IT IS ORDERED that Judgment shall be entered affirming the decision of the Commissioner of the Social Security Administration.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY

DATE: January 24, 2020

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE